UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KAREN LEEANN KRETOVIC,

                     Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

DECISION & ORDER

13-CV-6257P


## PRELIMINARY STATEMENT

Plaintiff Karen Leeann Kretovic ("Kretovic") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 14).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 13). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

## BACKGROUND

### I.    Procedural Background

Kretovic protectively filed for DIB on March 31, 2011, alleging disability beginning on July 9, 2010, due to left hip osteoarthritis, end plate sacral area edema, left and right hip bursitis, anxiety, depression and degenerative disc disease.  (Tr. 255, 277, 296).[1]  On May 26, 2011, the Social Security Administration denied Kretovic's claim for benefits, finding that she was not disabled.  (Tr. 69).  Kretovic requested and was granted a hearing before Administrative Law Lawrence Levey (the "ALJ").  (Tr. 20, 83-91, 192-96).  The ALJ conducted a hearing on November 5, 2012 in Rochester, New York.  (Tr. 30-68).  In a decision dated November 20, 2012, the ALJ found that Kretovic was disabled beginning on March 23, 2012, but was not disabled or entitled to benefits prior to that date.  (Tr. 13-20).

On March 22, 2013, the Appeals Council denied Kretovic's request for review of the ALJ's decision.  (Tr. 1-4).  Kretovic commenced this action on May 30, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.    Relevant Medical Evidence[2]

#### A.    Treatment Records

##### 1.    Ridgewood Medical Records

Treatment notes indicate that Kretovic received treatment from Michael T. Herbowy ("Herbowy"), MD, beginning in at least October 2008.  (Tr. 454).  On October 15, 2008, Kretovic attended an appointment with Herbowy for evaluation of her right shoulder.

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.  Kretovic does not challenge the ALJ's mental Residual Functional Capacity ("RFC") assessment.  Thus, records pertaining to Kretovic's mental impairments are not summarized herein.

(*Id.*).  During the appointment, Kretovic reported that she wanted to postpone evaluation of her right shoulder because she had been in a motor vehicle accident two days earlier.  (*Id.*).  Kretovic reported neck, back and left hip pain without bruising, bleeding or hematuria.  (*Id.*).  Upon examination, Herbowy noted that Kretovic's spine was not tender, but that there was marked paraspinous tenderness of the rhomboids and paraspinal muscles of the thoracic spine bilaterally, with the left worse than the right.  (*Id.*).  Herbowy assessed normal strength and tone in the left upper extremity and assessed that Kretovic's right upper extremity was limited due to known right rotator cuff pathology.  (*Id.*).  Herbowy noted that a straight leg test was negative and that Kretovic had tenderness upon internal rotation of the left hip and tenderness of the greater trochanter.  (*Id.*).  Herbowy diagnosed a thoracic and cervical strain and a left hip contusion, and ordered x-rays of those areas.  (*Id.*).  Herbowy instructed Kretovic to continue taking Naprosyn and prescribed Flexeril and Vicodin.  (*Id.*).  Herbowy noted that Kretovic might require physical therapy and recommended that she return in ten days.  (*Id.*).

On October 30, 2008, Kretovic returned for a follow-up appointment with Jessica M. Ross ("Ross"), a physician's assistant.  (Tr. 454-55).  Treatment notes indicate that x-rays of the thoracic and cervical spine and left hip were negative.  (*Id.*).  The notes further indicate that Kretovic reported some decrease in her pain and improvement in her back and neck.  (*Id.*).  Kretovic complained of bilateral knee pain and indicated that her knees had bruised after her last visit.  (*Id.*).  Kretovic reported that she planned to start physical therapy and that she continued to take Vicodin and Flexeril, which made her drowsy.  (*Id.*).  Upon examination, Ross noted paraspinal tenderness, normal strength in the left upper extremity and mild effusion in the knees with tenderness.  (*Id.*).  Ross recommended that Kretovic continue her current care for her neck, back and hip pain and ordered bilateral x-rays of her knees.  (*Id.*).

Undated treatment notes indicate that Herbowy assessed that Kretovic suffered from a shoulder impingement with bilateral trochanteric bursitis. (Tr. 456). Herbowy recommended that she discontinue Naprosyn and continue Vicodin as needed and prescribed a trial of Voltaren. (*Id.*). Herbowy noted that Kretovic was awaiting surgery. (*Id.*).

On February 27, 2009, Kretovic attended another appointment with Herbowy complaining of continued left hip pain despite a negative x-ray and physical therapy. (Tr. 458). Upon examination, Herbowy noted that her spine was not tender and the straight leg test was negative, although internal rotation of the left hip produced discomfort and the greater trochanter was painful upon palpation. (*Id.*). Herbowy assessed traumatic trochanteric bursitis, recommended that Kretovic continue taking her medication, and referred her to Matthew Tomaino ("Tomaino"), MD, for evaluation. (*Id.*). Kretovic also reported that she continued to experience pain in her shoulder and diminished range of motion. (*Id.*). Upon examination, Herbowy noted that Kretovic's left shoulder was tender in the AC joint and she had difficulty with extension and external rotation of the right shoulder. (*Id.*). Herbowy assessed persistent rotator cuff pain, likely secondary to a tear, and referred her to Tomaino for evaluation. (*Id.*).

On May 28, 2009, Kretovic informed Herbowy that she had been approved for shoulder surgery and that her trochanteric bursitis had "flared on and off." (*Id.*). Upon examination, Herbowy noted tenderness in her right shoulder, no tenderness in her spine, a negative straight leg test, full range of motion in her hips with discomfort upon internal rotation. (*Id.*).

Undated treatment notes indicate that Kretovic returned for treatment complaining of pain in her left hip. (Tr. 459). Kretovic reported that her hip "gives out" when she walks, causing a sharp pain. (*Id.*). She reported that her pain improves when she takes her medication

4

and stated that she had never gone to physical therapy.  (*Id.*).  Kretovic also reported that the pain

makes her sit "off to right side" and that she sometimes hears a click or a pop walking up or

down stairs.  (*Id.*).  Upon examination, Kretovic's hip demonstrated tender areas, full range of

motion with tenderness upon hip flexion, extension, abduction and internal rotations, but no

palpable click or pop.  (*Id.*).  She was instructed to undergo another x-ray of her left hip, to

continue her current medications, and to consider physical therapy or an orthopedic consultation.

(*Id.*).

      Kretovic had another physical examination in late January 2010.[3]  (Tr. 460-63).

During the examination, she demonstrated full range of motion in her back with no tenderness

upon palpation and five out of five strength in her extremities.  (*Id.*).  She was assessed to suffer

from right shoulder and bilateral hip pain, and the treatment notes indicate that she was being

treated by Michael Colucci ("Colucci"), MD, for hip pain and Tomaino for shoulder pain.  (*Id.*).

The treatment notes also indicate that Tomaino planned to perform arthroscopic surgery on her

shoulder in February and that Colucci was considering surgery or pain management to address

her hip pain.  (*Id.*).  The treatment notes suggest that Kretovic had gone to physical therapy and

received cortisone shots to address her bilateral hip pain.  (*Id.*).  The notes also suggest that she

had back surgery in 1986.  (*Id.*).  Upon examination, no numbness, tingling or weakness was

noted, and Kretovic demonstrated positive findings for right shoulder, bilateral hip and bilateral

knee pain, but no lower back pain.  (*Id.*).

      Undated treatment notes indicate that Kretovic returned for treatment complaining

of increased pain in her left hip.  (Tr. 464).  Kretovic reported that she had attended an

appointment with Colucci on June 12, 2010, after undergoing an MRI on June 8, 2010.  (*Id.*).

---

[3]  The treatment notes, many of which are handwritten, do not always make clear the identity of the
treatment provider.  (Tr. 460-66).

She indicated that Colucci had only discussed her hip bursitis, although the MRI had revealed other abnormalities. (*Id.*). Kretovic reported that cortisone shots were not effective and that Vicodin and Percocet were not offering relief. (*Id.*). Upon examination, she demonstrated no tenderness upon palpation of the bony landmarks in her hip, full range of motion with tenderness upon internal rotation, and strength was assessed to be five out of five. (*Id.*). The treatment plan included contacting Colucci to determine the MRI results and referring Kretovic for pain management. (*Id.*).

Kretovic returned for a follow-up appointment for her continued left hip pain. (*Id.*). She reported that the pain management clinic was unable to provide further relief because she had already received cortisone injections. (*Id.*). Kretovic reported that she had an appointment scheduled with Colucci on August 18, 2010 to attempt to determine whether her lower back pain was contributing to her hip pain. (*Id.*). She also reported that she had returned to work for four hours that day. (*Id.*). Upon examination, Kretovic demonstrated full range of motion in her left hip, except she resisted abduction and internal rotation, and no tenderness was noted upon palpation. (*Id.*).

Kretovic returned for treatment complaining of back pain that radiated to her hips and legs. (Tr. 465). She reported that she had decided against having surgery with Dr. Capicotto. (*Id.*). In addition, she reported that Dr. Gargano at the pain management clinic had recommended epidural steroid injections, but would not be able to administer an injection until February 2011. (*Id.*). Kretovic reported that her current medications did not offer much relief. (*Id.*). Upon examination, she demonstrated no tenderness over her spine with positive paraspinal lumbar tenderness, full range of motion with increased tenderness with extension, strength of

five out of five and a negative straight leg raise.  (*Id.*).  Kretovic was prescribed an increased

dose of Neurotonin and advised to follow-up with Dr. Gargano for injections.  (*Id.*).

Treatment notes indicate that Kretovic called and complained that the increased

dosage of Neurotonin was too sedating and that Tramadol and Vicodin offered no relief.  (*Id.*).

She reported taking Percocet with some relief and requested a refill of her prescription.  (*Id.*).

During a subsequent phone call, Kretovic reported that she had received a cortisone injection at

the pain management clinic, but that it had provided only four days of relief.  (*Id.*).

Treatment notes indicate that Kretovic attended an appointment with Guinevere

Hellems ("Hellems"), a physician's assistant.  (Tr. 466).  During the visit, she continued to

complain of left hip and back pain.  (*Id.*).  Upon examination, Hellems noted no tenderness of the

lumbar spine, the paraspinal muscles or the SI joints, and a negative straight leg raise and

strength of five out of five, but noted increased pain upon internal rotation of the left hip.  (*Id.*).

Kretovic reported that Dr. Gargano had suggested a referral to an orthopedic physician for

evaluation.  (*Id.*).

On May 4, 2011, Kretovic attended an appointment with Herbowy complaining of

left hip pain.  (Tr. 467).  She reported that the injections had failed to relieve her pain and that

she was waiting for another opinion from an orthopedist.  (*Id.*).  Upon examination, Herbowy

noted that her lumbar spine and paraspinal muscles were non-tender and that the straight leg test

was negative.  (*Id.*).  Herbowy also noted that she was very tender upon internal rotation of her

left hip.  (*Id.*).  Herbowy felt that Kretovic's left hip had not been fully assessed and determined

that she might suffer from a labral tear from the motor vehicle accident.  (*Id.*).  He referred

Kretovic to Dr. Giordano at Strong for evaluation.  (*Id.*).

On June 19, 2012, Kretovic attended an appointment with Casey M. Hanaburgh ("Hanaburgh"), a physician's assistant.  (Tr. 554-57).  She reported that she continued to suffer from severe low back and left hip pain, which interfered with her sleep.  (*Id.*).  Kretovic reported that she continued to receive regular epidural injections, but that they did not provide lasting relief, and that she managed her pain with Percocet and Mobic.  (*Id.*).  Kretovic complained that she was lethargic and constantly tired and had been out of work since January.  (*Id.*).  Kretovic reported that she did not suffer from muscle aches, weakness or swelling in her extremities. (*Id.*).  Upon examination, she demonstrated normal tone and motor strengths with no contractures, malalignment or bony abnormalities in her joints, bones or muscles.  (*Id.*). Hanaburgh noted tenderness over the lateral hip with increased tenderness upon hip flexion and abduction.  (*Id.*).  Hanaburgh also noted that her gait and station were normal and her cranial nerves were grossly intact.  (*Id.*).

On August 15, 2012, Kretovic attended an appointment with Veronika McGraw ("McGraw"), a physician's assistant.  (Tr. 549-54).  During the appointment, Kretovic complained of swelling and redness in her right elbow.  (*Id.*).  Upon examination, McGraw assessed full range of motion and strength of five out of five in her arm.  (*Id.*).

### 2.      Darrick J. Alaimo, MD

Treatment records indicate that Kretovic received treatment from Darrick J. Alaimo ("Alaimo"), MD, beginning in April 2008.  (Tr. 409-10).  The treatment records suggest that Herbowy referred her to Alaimo for a neurological consultation.  (*Id.*).  According to the records, Kretovic suffered from neck pain that radiated to her right upper extremity, with associated numbness, tingling and weakness since a work injury on March 29, 2007.  (*Id.*).  She reported experiencing pain and numbness in her neck, right shoulder and right anterolateral arm.

(*Id.*).  According to Kretovic, cortisone injections provided significant relief and physical therapy provided some relief, although her sessions had been cancelled by the compensation insurance company.  (*Id.*).  She reported weakness in her right hand.  (*Id.*).

Alaimo's notes indicate that Kretovic had previously been evaluated by Dr. Colucci, an orthopedic doctor who had opined that an MRI of her shoulder was negative, but planned to perform an arthroscope for further evaluation.  (*Id.*).  Upon examination, Alaimo noted tenderness to palpation of the right posterolateral cervical and trapezius muscles and Tinel's sign was positive at both elbows and wrists.  (*Id.*).  Additionally, Phalen's sign was positive on the right side for symptoms in right digits 4-5, although the Grind and Finklestein's tests were negative.  (*Id.*).  Alaimo noted no tenderness to palpation of the wrists, epicondyles or CMC joints, but did note tenderness to palpation of the right anterior shoulder.  (*Id.*).  Alaimo assessed pain with abduction and flexion of the right shoulder greater than 110 degrees and full internal rotation.  (*Id.*).  According to Alaimo, external rotation and extension of the shoulder did not reproduce any symptoms, and Kretovic had full range of motion in her left shoulder.  (*Id.*).

Alaimo assessed normal muscle bulk, tone and strength in all four extremities, except for slight weakness in the right bicep and infraspinatus muscles and four out of five weakness of the right deltoid muscle, with at least some of the weakness related to pain.  (*Id.*).  Alaimo opined that Kretovic's sensation was normal and the Romberg test was negative.  (*Id.*).  Alaimo concluded that Kretovic might suffer from right upper brachial plexopathy or cervical radiculopathy, right CTS or ulnar neuropathy.  (*Id.*).  Alaimo recommended an EMG.  (*Id.*).

On June 20, 2008, Kretovic returned for a follow-up appointment with Alaimo. (Tr. 411-12).  During the appointment, Alaimo assessed that she suffered from mild right ulnar neuropathy at her elbow, which he hoped would improve with conservative measures.  (*Id.*).

Alaimo opined that the condition was likely the result of her sleeping position at night and not

the result of her 2007 injury.  (*Id.*).  Alaimo did not recommend surgery.  (*Id.*).  With respect to

Kretovic's reported right arm weakness, Alaimo opined that the EMG findings did not suggest

any denervation in any muscles of her right arm.  (*Id.*).  Accordingly, Alaimo believed that the

weakness was more likely due to pain rather than underlying muscle weakness or nerve injury or

impingement.  (*Id.*).  With respect to Kretovic's neck pain, Alaimo indicated that there was no

evidence of right cervical radiculopathy based upon the EMG results.  (*Id.*).  Alaimo opined that

Kretovic's impairments likely stemmed from a right shoulder injury and recommended

continued treatment with Colucci.  (*Id.*).

### 3.      Orthopaedic Associates of Rochester, PC

Treatment notes indicate that in July 2008 Herbowy referred Kretovic to Colucci,

an orthopedist practicing at the Orthopaedic Associates of Rochester, PC.  (Tr. 415).  On July 17,

2008, Colucci evaluated Kretovic's right shoulder.  (*Id.*).  During the appointment, Kretovic

complained of difficulty with overhead use of her arm, but denied numbness or tingling in her

extremity.  (*Id.*).

Upon examination, Colucci noted no tenderness in the cervical spine and no

edema or deformities in the right shoulder.  (*Id.*).  According to Colucci, Kretovic could actively

forward elevate her right arm to 140 degrees and abduct to 120 degrees.  (*Id.*).  Colucci noted

positive impingement with direct abduction.  (*Id.*).  He also noted slight residual crepitance with

internal and external rotation.  (*Id.*).  According to Colucci, she demonstrated strength resistance

of four out of five with external rotation, and her distal motor examination was five out of five.

(*Id.*).  Kretovic had a strong radial pulse and her sensation was intact.  (*Id.*).  Colucci also noted

that the electrodiagnostic study performed by Alaimo revealed mild right ulnar neuropathy without evidence of denervation or radiculopathy.  (*Id.*).

Colucci assessed a persistent right shoulder impingement with moderate AC joint degenerative arthritis causally related to Kretovic's work injury.  (*Id.*).  Colucci recommended a diagnostic right shoulder arthroscopy, and arthroscopic subacromial decompression and possibly a rotator cuff repair.  (*Id.*).

Kretovic returned for a follow-up appointment with Colucci on September 11, 2008.  (Tr. 416).  During the appointment, Kretovic explained that she had a surgical phobia.  (*Id.*).  They discussed other treatment options, and Colucci told her to return for treatment if her symptoms worsened.  (*Id.*).  The treatment notes indicate that Kretovic continued to work, and Colucci recommended that she be restricted from overhead use of her right arm.  (*Id.*).

On November 6, 2008, Kretovic attended another appointment with Colucci.  (Tr. 417).  During the appointment, Colucci attempted to determine the loss of use of her right shoulder.  (*Id.*).  Colucci assessed limitation in her range of motion in her right shoulder and impingement with direct abductions.  (*Id.*).  Colucci noted no crepitance with range of motion and distal strength of five out of five.  (*Id.*).  Again, Kretovic demonstrated a strong radial pulse and intact sensation.  (*Id.*).  Colucci opined that Kretovic would likely improve with surgery and he assessed that she would qualify for twenty percent schedule loss of use of the right shoulder due to her limited range of motion.  (*Id.*).  Again, Colucci recommended that she be restricted from overhead use of her right arm.  (*Id.*).

In June 2009, Herbowy referred Kretovic to the orthopedic practice group for evaluation of her bilateral hip pain.  (Tr. 418-19).  Kretovic met with David Paniccia ("Paniccia"), a physician's assistant, and reported experiencing pain in both hips since a 2008

motor vehicle accident.  (*Id.*).  Kretovic reported that she had been taking anti-inflammatory medications and using Vicodin to manage her pain.  (*Id.*).  Kretovic reported that she had been informed that she suffered from trochanteric bursitis and that her x-rays were negative.  (*Id.*).

Upon examination, Paniccia noted that Kretovic was able to get onto the examination table without assistance and had a normal gait.  (*Id.*).  Paniccia noted tenderness over both trochanteric bursas, but no groin tenderness.  (*Id.*).  According to Paniccia, Kretovic's hip flexion was 90 degrees with good internal and external rotation with mild discomfort.  (*Id.*). Kretovic had a negative straight leg raise and cross straight leg raise.  (*Id.*).  Paniccia noted that Kretovic had good range of motion in her knees bilaterally, a negative Homan's sign, good motor strength and that her CMS was grossly intact.

Paniccia reviewed images and noted that they demonstrated no signs of acute fracture, dislocation or other bony abnormalities.  (*Id.*).  He assessed bilateral trochanteric bursitis and administered cortisone injections for both hips.  (*Id.*).

On July 28, 2009, Kretovic returned for a follow-up appointment with Colucci and reported that the cortisone injections had provided relief, although she was experiencing anterior thigh and groin discomfort bilaterally.  (Tr. 420).  She stated that she attempted to relieve the pain using heat, ice and anti-inflammatory medication.  (*Id.*).  Kretovic reported that the pain radiated down her legs bilaterally, but denied experiencing back pain, numbness or tingling.  (*Id.*).

Upon examination, Colucci noted that Kretovic walked without a limp and demonstrated no tenderness in her lumbosacral spine.  (*Id.*).  Kretovic was able to flex forward with her fingertips to her ankles.  (*Id.*).  According to Colucci, Kretovic experienced no groin pain upon internal and external rotation of her hips, but was minimally tender in the greater

trochanter region bilaterally.  (*Id.*).  Strength in Kretovic's lower extremities was five out of five bilaterally, and her sensation was intact.  (*Id.*).

Colucci assessed an improved bilateral hip greater trochanteric bursitis and opined that the pain radiating to her thighs could be radiculopathy, but noted that her objective neurological findings were normal.  (*Id.*).  Colucci determined that Kretovic might need repeat cortisone injections if her symptoms worsened and evaluation by a spine specialist if her radicular symptoms worsened.  (*Id.*).  Colucci indicated that he did not recommend any restrictions.  (*Id.*).

On September 8, 2009, Kretovic returned for an appointment with Colucci complaining of bilateral hip discomfort.  (Tr. 422).  She denied any groin pain or radicular symptoms.  (*Id.*).  Upon examination, she demonstrated no groin pain with internal and external rotation and mild tenderness of the greater trochanter region that was more pronounced on the left side.  (*Id.*).  According to Colucci, Kretovic's strength was five out of five, her sensation was intact, and the straight leg testing was negative.  (*Id.*).  Colucci assessed mildly symptomatic bilateral hip greater trochanteric bursitis without radiculopathy, recommended that Kretovic continue managing her symptoms with Naproxen, and indicated that she could continue to work without any hip-related restrictions.  (*Id.*).

On October 6, 2009, Kretovic returned for an appointment with Paniccia, complaining of pain over the lateral aspects of her hips.  (Tr. 423).  Upon examination, Paniccia noted that Kretovic demonstrated a normal gait and no acute distress.  (*Id.*).  Paniccia noted that both hips demonstrated "exquisite tenderness" over the trochanteric bursa without groin tenderness.  (*Id.*).  Paniccia noted that straight leg raise and cross straight leg raise tests were

negative and that her CMS was grossly intact.  (*Id.*).  Paniccia assessed bilateral trochanteric

bursitis and administered cortisone injections.  (*Id.*).

On May 18, 2010, Kretovic attended another appointment with Colucci.

(Tr. 425-26).  She complained of left hip discomfort without groin or calf pain, numbness or

tingling.  (*Id.*).  Kretovic reported that her right hip was not symptomatic and denied back pain.

(*Id.*).  Upon examination, Colucci noted tenderness at the greater trochanter, a negative straight

leg raise test, strength of five out of five, and intact sensation.  (*Id.*).  Colucci assessed

symptomatic left hip greater trochanteric bursitis and administered a cortisone injection.  (*Id.*).

Colucci recommended an MRI of the left hip if her symptoms persisted.  (*Id.*).

Kretovic returned for a follow-up appointment with Colucci on June 11, 2010,

reporting only mild relief from the previous cortisone injection.  (Tr. 428).  She reported ongoing

left hip pain without groin pain or radicular symptoms.  (*Id.*).  Upon examination, Colucci noted

that Kretovic appeared comfortable and ambulated without a limp.  (*Id.*).  Kretovic demonstrated

left hip flexion to 120 degrees without groin pain and internal and external rotation of the right

hip without groin pain.  (*Id.*).  Colucci opined that Kretovic remained slightly tender at the

greater trochanter and had mild tenderness throughout the buttock musculature without a

palpable mass.  (*Id.*).  According to Colucci, Kretovic demonstrated strength of five out of five

and intact sensation.  (*Id.*).

Colucci reviewed the results of an MRI, which demonstrated mild thickening of

the greater trochanteric bursae bilaterally and mild left gluteus medias tendonopathy.  (*Id.*).  The

MRI also demonstrated slight ossification at the superolateral left acetabulum without significant

degenerative change of the joint and a mild chondral wear over the superior aspect of the femoral

head.  (*Id.*).  Colucci noted degenerative disc disease of the lumbosacral spine.  (*Id.*).  Colucci

assessed left hip greater trochanteric bursistis and informed Kretovic that surgery was not recommended.  (*Id.*).  He recommended that she continue to take Naprosyn daily, which seemed to help, and noted that additional cortisone injections might be appropriate.  (*Id.*).

Kretovic returned for an appointment with Colucci on July 15, 2010 complaining of left hip and low back pain.  (Tr. 427).  Kretovic indicated that she had gone to the Emergency Department at Unity Hospital due to the pain.  (*Id.*).  Kretovic denied any radicular symptoms.  (*Id.*).  Upon examination, Colucci assessed positive tenderness of the greater trochanter, a negative straight leg raise test, strength of five out of five and intact sensation.  (*Id.*).  Colucci administered cortisone injections and recommended that Kretovic be evaluated by a spine specialist for her low back pain.  (*Id.*).

### 4.    Borg and Ide Imaging, PC

Treatment notes indicate that Kretovic underwent several imaging procedures at Borg and Ide Imaging, PC ("B&I").  On October 15, 2008, images were taken of Kretovic's left hip and cervical spine, which demonstrated no acute fracture or dislocation with the left femoral head and neck intact.  (Tr. 432-33).  The images also demonstrated that the pelvic ring was intact and the sacroillic joints were patent.  (*Id.*).  No acetabular osteophyte formation was noted, although minor degenerative change of the lower lumbar spine was observed.  (*Id.*).  Images of the cervical spine demonstrated no fracture or dislocation and well-maintained disc spaces.  (*Id.*).  The radiologist noted minimal osteophyte formation extending from the anterior margins of the C5 and C6 vertebrae and that the prevertebral soft tissue planes were intact.  (*Id.*).  The radiologist assessed a normal thoracic spine.  (*Id.*).

On November 4, 2008, images were taken of Kretovic's knees.  (Tr. 435).  The images demonstrated no fracture, dislocation, significant bony change, joint effusion, loose body,

opaque foreign body or significant degenerative change.  (*Id.*).  The radiologist assessed negative examinations.  (*Id.*).

On December 18, 2008, an image was taken of Kretovic's left hip and pelvis. (Tr. 434).  The images demonstrated no fracture, dislocation, acetabular osteophyte formation or bone erosions.  (*Id.*).  The radiologist assessed a normal left hip and pelvis.  (*Id.*).

On June 8, 2010, Kretovic underwent an MRI of her left hip.  (Tr. 436-39).  The MRI demonstrated no occult fracture, osteonecrosis or significant hip joint effusion, but did reveal mild thickening of both greater trochanteric bursae, along with mild tendinopathy of the left gluteus medius attachment.  (*Id.*).  The MRI also demonstrated ossification in the left superolateral labrum, mild subchondral cystic change at the anterior femoral head/neck junction and a small amount of productive osseous change.  (*Id.*).  Additionally, partial loss of normal intervertebral T2 disc signal at L4-5 and L5-S1 with reactive endplate changes were noted at L4-5.  (*Id.*).

On September 17, 2010, Kretovic underwent a lumbar discogram.  (Tr. 440-43). Frederick Cohn ("Cohn"), MD, assessed a markedly positive and concordant response during pressurization at L4-5 that closely reproduced Kretovic's symptom complex and a partially concordant response during pressurization at L5-S1 that reproduced a portion of Kretovic's central low back pain.  (*Id.*).

That same day, Kretovic underwent a CT scan of her lumbar spine.  (Tr. 444-47). Cohn assessed "full thickness posterior radial annular tears with epidural extravasation at L4-L5, which [was] likely a postoperative level as well as at L5-S1."  (*Id.*).  Cohn also assessed "[d]egenerative changes with radial annular fissuring and extension through the outer annular fibers on the right at both L3-L4 and L2-L3."  (*Id.*).

On August 26, 2010, an MRI of Kretovic's lumbar spine was taken.  (Tr. 568-69).
The MRI demonstrated a mild circumferential disc bulge and a tiny left foraminal protrusion at
L2-3.  (*Id.*).  At L3-4, Kretovic had a mild generalized disc bulge, a tiny annular tear posterior
midline, a superimposed right foraminal protrusion projecting into the inferior margin of the
foramen that was not clearly impinging the exiting L3 nerve root.  (*Id.*).  At L4-5, moderate disc
space narrowing was noted, as well as a generalized disc bulge with more prominent disc and
osteophyte complexes projecting into the inferior aspect of the bilateral foramina with no clear
nerve root impingement.  (*Id.*).  The MRI also showed borderline mild central stenosis and
partial laminectomies with no appreciable enhancing fibrosis.  (*Id.*).  At L5-S1, the MRI
demonstrated a midline disc protrusion into anterior epidural fat with minimal mass effect upon
the thecal sac, but no clear impingement of the emerging S1 nerve roots and mild facet
arthropathy.  (*Id.*).

The radiologist assessed borderline mild multifactorial L4-5 central stenosis, right
foraminal L3-4 protrusion that was not clearly impinging the right L3 nerve root, tiny left L2-3
foraminal protrusion not impinging the L2 nerve root, and shallow midline L5-S1 protrusion.
(*Id.*).

On December 21, 2011, Kretovic underwent another MRI of her lumbar spine.
(Tr. 570-71).  The radiologist assessed no focal or diffuse disc abnormality, spinal canal stenosis
or neural foraminal encroachment at L1-2.  (*Id.*).  At L2-3, the radiologist noted a small posterior
disc bulge/osteophyte complex with unchanged very minimal left foraminal extensions and mild
posterior element degeneration, but the AP dimension of the thecal sac was not substantially
narrowed.  (*Id.*).  At L4-5, the radiologist noted decompressive changes.  According to the
radiologist, there was concern over new or worsening posterior disc bulge/osteophyte eccentric

to the left, causing impression on the ventral margin of the thecal sac which was not substantially

narrowed.  (*Id.*).  Additional moderate biforminal extension of the disc/osteophyte was noted

with narrowing of the left lateral recess.  (*Id.*).  At L5-S1, the radiologist observed a small

posterior disc bulge/osteophyte complex that was causing minimal impression on the ventral

margin of the thecal sac and that the neural foramina were unchanged.  (*Id.*).

### 5.    **Tomaino Orthopaedic Care**

Treatment notes indicate that Herbowy referred Kretovic to Tomaino for

evaluation of her right shoulder impairment, and she attended an appointment with him on

March 31, 2009.  (Tr. 449).  Kretovic reported that she had received treatment from Colucci,

who had recommended surgery, but that Kretovic did not want to be placed under anesthesia.

(*Id.*).  Tomaino explained that he could perform an arthroscopic procedure using a nerve block.

(*Id.*).  Kretovic expressed interest, and Tomaino indicated that he would schedule the surgery

once the insurance carrier had approved it.  (*Id.*).  Kretovic attended a follow-up appointment on

December 30, 2009.  (*Id.*).  During the appointment, Tomaino noted that a 2008 MRI for

Kretovic's right shoulder demonstrated an irregularity under the supraspinatus along with

subcapsular thickening.  (*Id.*).  Tomaino again recommended surgery.  (*Id.*).

On April 7, 2010, Kretovic attended a post-surgery follow-up appointment with

Tomaino.  (Tr. 451).  Kretovic reported that she had been attending physical therapy.  (*Id.*).

After examination, Tomaino indicated that she could return to work without restrictions the

following week.  (*Id.*).

On February 18, 2011, Kretovic returned to Tomaino complaining of continued

right shoulder pain.  (*Id.*).  Upon examination, Tomaino noted no signs of weakness or atrophy

and that she was neurovascularly intact distally.  (*Id.*).  Tomaino recommended obtaining an

MRI of her shoulder to rule out any interval changes.  (*Id.*).  Tomaino assessed Kretovic's

temporary impairments at zero percent.  (*Id.*).

### 6.      <u>Unity Hospital Records</u>

Treatment records indicate that Kretovic went to the Emergency Department at

Unity Hospital ("Unity") on September 14, 2006 complaining of pain in her right arm and

collarbone after falling off a trampoline.  (Tr. 372-75).  Kretovic was instructed to rest, ice and

use a sling as needed on her right arm.  (*Id.*).  Kretovic returned to the Emergency Department on

October 7, 2008 after she slipped on stairs and injured her chin.  (Tr. 376-79).  Kretovic was

advised to follow-up with her doctor or dentist as needed.  (*Id.*).

On July 27, 2010, upon referral by Herbowy, Kretovic began treatment with

Jennifer A. Gargano ("Gargano"), MD, at Unity's Pain Practice Department.  (Tr. 364-66).

During the appointment, Kretovic reported that she worked part-time as a medical receptionist.

(*Id.*).  She explained that she experienced back pain and bilateral hip pain following an accident

in 2008.  (*Id.*).  According to Kretovic, her right hip and lower back pain had resolved, but she

continued to experience pain in her left hip and "rare low back pain."  (*Id.*).  Kretovic denied any

radicular pain symptoms, numbness or tingling in her extremities.  (*Id.*).  Kretovic reported that

her pain increased with standing and bending and is relieved through heat, cold and medication.

(*Id.*).

Upon examination, Gargano noted that Kretovic's gait was mildly antalgic,

favoring her right side, but her heel to toe walk was normal.  (*Id.*).  Gargano observed that

Kretovic had moderately reduced range of motion in her lumbar spine on forward flexion and

extension with no pain on palpation of the lumbar spine.  (*Id.*).  Gargano noted that the left

sacroiliac joint was moderately tender and that Kretovic had tenderness on palpation in her left

greater trochanter with pain upon internal and external rotation of the left hip.  (*Id.*).  According to Gargano, a left-sided Faber test was positive, and Kretovic's motor strength was five out of five in the calves and upon flexion of the feet bilaterally.  (*Id.*).  Additionally, motor strength was four out of five in her thighs bilaterally, and her sensation was intact.  (*Id.*).

Gargano assessed left hip pain with a mild impingement demonstrated by an MRI, mild left sacroiliac dysfunction and a history of lumbar laminectomy.  (*Id.*).  Gargano recommended an x-ray of the lumbar spine and a possible MRI.  (*Id.*).  Gargano explained that Kretovic's painful symptoms likely originated in her left hip and she was unlikely to be able to have additional steroid injections at that time.  (*Id.*).  Gargano recommended that Kretovic manage her pain with opioid analgesics and NSAIDs, although she wanted Kretovic to consult her gastrointestinologist before prescribing an NSAID.  (*Id.*).

On October 5, 2010, Kretovic attended a follow-up appointment with Gargano.  (Tr. 352-53).  Kretovic reported that she had recently undergone a lumbar discogram and that Dr. Capicotto had advised her that surgery was not indicated.  (*Id.*).  Kretovic wanted to explore other pain management options.  (*Id.*).  Kretovic reported experiencing localized pain in the left buttocks, left groin and hip, and denied any radicular pain.  (*Id.*).  She denied experiencing any numbness, tingling, weakness or incontinence.  (*Id.*).  Kretovic reported that she had not had physical therapy.  (*Id.*).

Upon examination, Gargano noted an antalgic gait, favoring the right side and tenderness to the left sacroiliac joint and the left greater trochanter.  (*Id.*).  Gargano noted that a left-sided Faber test was positive.  (*Id.*).  According to Gargano, Kretovic's strength was five out of five in her lower extremities.  (*Id.*).  Gargano recommended Gabapentin, and physical therapy or chiropractic care.  (*Id.*).

Following the appointment, Gargano reviewed the lumbar discogram report and CT scan of Kretovic's lumbar spine. (Tr. 350). Gargano also reviewed a consultation note from Capicotto, who recommended long-term pain management and did not recommend further surgery. (*Id.*). Gargano contacted Kretovic and recommended that she continue conservative care and return for a follow-up appointment in early 2011. (*Id.*).

On January 24, 2011, Kretovic returned for a follow-up appointment with Gargano. (Tr. 354-55). Kretovic reported ongoing pain in her left hip and pelvis and noted that she rarely experienced numbness in her left foot or in her knee and hip. (*Id.*). Kretovic reported that she regularly exercised and stretched and that her pain worsened with activity and was not relieved by any of her medication. (*Id.*).

Upon examination, Gargano noted a normal gait and a five out of five strength in the lower extremities. (*Id.*). According to Gargano, the straight leg raise test was negative bilaterally, and Kretovic's sensation was intact. (*Id.*). Gargano's examination of Kretovic's back revealed that the lumbar lordosis was preserved and there was no tenderness upon palpation of the midline lumbar spine or paraspinous region. (*Id.*). According to Gargano, Kretovic's left sacroiliac joint was tender, and the left greater trochanter bursa was also tender. (*Id.*). The Faber test was positive on the left side. (*Id.*). Gargano recommended an injection to Kretovic's left sacroiliac joint and left hip. (*Id.*). Gargano also considered a lumbar epidural steroid injection at L3-L4 or the left L4-L5. (*Id.*). On January 26, 2011, Gargano administered injections to Kretovic's left sacroiliac joint and left greater trochanter bursa. (Tr. 356-57).

On February 14, 2011, Kretovic attended another appointment with Gargano complaining of pain in her left buttocks and hip. (Tr. 358-59). Kretovic arrived in a wheelchair and reported that the injections had relieved her pain for four days, but it had returned to full

intensity.  (*Id.*).  Kretovic denied any radicular pain, numbness or weakness of the extremities.
(*Id.*).  Kretovic reported that the most intense pain was located in her left hip and was
exacerbated by walking.  (*Id.*).

Upon examination, Gargano observed that Kretovic was in moderate distress and
had an antalgic gait.  (*Id.*).  Kretovic had no tenderness in the lumbar spine or paraspinous
region.  (*Id.*).  Gargano noted that her right and left sacroiliac joints were not tender, although her
right greater trochanter bursa was tender.  (*Id.*).  Gargano assessed limited range of motion in her
hip with pain on internal and external rotation.  (*Id.*).  Her straight leg raise was negative
bilaterally, and she demonstrated five out of five strength in her extremities and intact sensation.
(*Id.*).

Gargano opined that Kretovic presented a "complicated case" because the
injections provided only temporary pain relief.  (*Id.*).  Gargano opined that the pain might stem
from her back and suggested an epidural steroid injection that would be both diagnostic and
therapeutic for any pain radiating from the back.  (*Id.*).  Prior to performing the injection,
Gargano suggested that Kretovic follow-up with an orthopedic physician to be evaluated for her
left hip pain.  (*Id.*).  Gargano administered a Toradol injection for pain relief and advised her to
follow-up with Herbowy for continued medication management.  (*Id.*).

On January 23, 2012, Kretovic returned to Gargano for treatment.  (Tr. 508-09).
According to the treatment notes, Kretovic was experiencing pain in her lower back in the
coccyx that radiated to her left lateral thigh with tingling along the bottom of her feet and toes.
(*Id.*).  Kretovic reported left leg weakness and was ambulating with a cane.  (*Id.*).

Upon examination, Gargano noted no tenderness to the midline or paraspinous
regions of her lower back, but did note mild tenderness in the left sacroiliac joint.  (*Id.*).  In

addition, Gargano noted tenderness in the greater trochanters.  (*Id.*).  Gargano assessed motor

strength as five out of five in the thighs, calves and upon flexion of the feet and that Kretovic's

sensation was intact.  (*Id.*).  Gargano reviewed the results of an MRI conducted on December 21,

2011, and assessed that Kretovic suffered from low back pain and left lower extremity radicular

pain.  (*Id.*).  Gargano recommended a left L4 transforaminal epidural steroid injection.  (*Id.*).  On

February 15, 2012, Gargano administered the injection.  (Tr. 506-07).

Kretovic returned for a follow-up appointment with Gargano on June 22, 2012.

(Tr. 543-44).  She reported that the injection took approximately four weeks to provide any relief

and the relief lasted about two weeks.  (*Id.*).  Kretovic believed that the injections administered

to her left sacroiliac joint and left greater trochanter bursa were more effective.  (*Id.*).  She denied

radicular pain, numbness, weakness or incontinence and reported experiencing pain in both hips.

(*Id.*).

Upon examination, Gargano noted no pain upon palpation in the lumbar spine,

paraspinous regions or the sacroiliac joints, but noted tenderness in the left greater trochanter

bursa.  (*Id.*).  The Faber test was positive on the left side for hip pain and decreased range of

motion of the left hip, but negative on the right side.  (*Id.*).  According to Gargano, the straight

leg raise was negative bilaterally and Kretovic demonstrated five out of five strength and no

sensory deficits in her lower extremities.  (*Id.*).  Gargano administered a left greater trochanter

bursa injection.  (*Id.*).

### 7.      Greater Associates of Orthopaedics

On August 18, 2010, Kretovic began receiving treatment at Greater Associates of

Orthopaedics.  (Tr. 533-34).  On that date, she met with Leslie Sonders ("Sonders"), a

physician's assistant.  (*Id.*).  Kretovic complained of low back and bilateral hip pain without

radiation to her legs, numbness or tingling.  (*Id.*).  Kretovic reported that she had recently gone to

the emergency room due to her back and hip pain.  (*Id.*).  Kretovic reported that she had

attempted physical therapy, but discontinued it because her insurance did not cover it.  (*Id.*).

Kretovic reported that Colucci had administered injections, but they had decreased in

effectiveness.  (*Id.*).  Kretovic reported that she is able to work only four hours a week due to

pain.  (*Id.*).

       Upon examination, Sonders noted no tenderness upon palpation in the

lumbosacral spine, but noted tenderness in the trochanteric bursa.  (*Id.*).  Kretovic was able to

flex forward so that her fingertips reached her shin, and her extension was mildly limited and

painful across her low back.  (*Id.*).  Kretovic's gait was reciprocal and she performed the toe

walk without difficulty.  (*Id.*).  Sonders assessed that Kretovic's strength was generally five out

of five, although Sonders noted some weakness of her bilateral adductors.  (*Id.*).  Kretovic's

sensation was intact in her lower extremities bilaterally, and she had full range of motion in her

hips without pain.  (*Id.*).  Sonders recommended physical therapy for lumbar stabilization and an

MRI of the lumbosacral spine.  (*Id.*).

       On September 8, 2010, Kretovic attended a follow-up appointment with Sonders

and Peter Capicotto ("Capicotto"), MD, to review the results of her MRI.  (Tr. 535-36).  She

continued to complain of low back and hip pain, but denied radicular leg pain, numbness or

tingling.  (*Id.*).  Upon examination, Kretovic was able to flex forward so that her fingertips

reached her shin, although her extension was mildly limited due to pain across her lower back.

(*Id.*).  According to Sonders, Kretovic's lower extremity strength was five out of five and her

sensation was intact bilaterally.  (*Id.*).  Sonders reviewed the MRI results and noted that they

demonstrated mild degeneration at L2-3, L3-4 and L5-S1 and significant degeneration at L4-5

with endplate edema and mild stenosis. (*Id.*). Kretovic indicated that she was considering lumbar fusion surgery. (*Id.*). Sonders and Capicotto advised her that she needed to undergo a lumbar discogram prior to being considered for surgery. (*Id.*). Kretovic was instructed to follow-up after undergoing the discogram. (*Id.*).

On September 22, 2010, Kretovic returned for a follow-up appointment with Capicotto. (Tr. 537-38). She reported that the discogram had reproduced her symptoms and that she was able to complete housework following her discogram. (*Id.*). Capicotto noted that Kretovic's gait was normal and that she ambulated around the room easily and demonstrated good strength in her lower extremities. (*Id.*). Capicotto reviewed the results of the discogram and recommended against surgery and in favor of continued treatment at the pain clinic. (*Id.*). Capicotto advised her to return for treatment if she developed any progressive neurological symptoms. (*Id.*).

Kretovic returned for an appointment with Capicotto on November 9, 2011. (Tr. 539-40). She reported continued back and hip pain and difficulty urinating. (*Id.*). Upon examination, Capicotto noted that Kretovic could flex forward so that her fingertips reached her knees and that her extension was mildly limited due to mild pain. (*Id.*). Capicotto assessed her sensation was intact in her lower extremities bilaterally and that she demonstrated strength at five out of five. (*Id.*). Capicotto recommended that Kretovic obtain another MRI of the lumbosacral spine. (*Id.*).

On December 23, 2011, Capicotto reviewed the MRI results and noted an increase in disc degeneration at L4-5 and a more pronounced disc osteophyte complex to the left with moderate left foraminal narrowing. (*Id.*). Capicotto recommended that Gargano administer a series of nerve root blocks on the left side at L4-5 for both diagnostic and therapeutic purposes.

25

(*Id.*).  Capicotto instructed Kretovic to return for evaluation after she had received at least two nerve blocks.  (*Id.*).

### 8.   Metro Footcare Associates, LLP

On August 5, 2010, Kretovic met with Pearce Sloan ("Sloan"), DPM, a podiatrist, for evaluation of her left foot pain.  (Tr. 429-30).  Kretovic reported that she experienced pain due to a motor vehicle accident and was being treated at a pain clinic.  (*Id.*).  Sloan assessed that Kretovic's reflexes and sensations were within normal limits bilaterally and noted pain upon palpation of the plantar and medial aspect of her heels bilaterally.  (*Id.*).  Sloan reviewed x-rays that demonstrated bilateral, plantar heel spurs.  (*Id.*).  Sloan administered cortisone injections, prescribed Relafen, and recommended ice, elevation, rest, stretching, supportive shoes, no barefoot walking and orthotics.  (*Id.*).

### 9.   University of Rochester Medical Center

On June 8, 2011, Kretovic began receiving treatment from Brian D. Giordano ("Giordano"), MD, at the University of Rochester Medical Center Orthopaedic and Rehabilitation Associates ("URMC").  (Tr. 514-15).  Kretovic reported that she had been experiencing bilateral hip pain since a motor vehicle accident and had attempted several pain management techniques.  (*Id.*).  She also reported a multi-level lumbar disc herniation with occasional numbness and tingling in her lower extremities.  (*Id.*).  Kretovic ambulated with a cane and indicated that strenuous activities aggravated her symptoms.  (*Id.*).

Upon examination, Giordano noted that Kretovic had full range of motion in her cervical spine and did not demonstrate upper motor neuron signs or cervical myelopathy.  (*Id.*). Giordano noted that she was mildly tender over the lumbosacral spine at the spinous processes, the paraspinal muscles bilaterally and the sacroiliac joints and over the peritrochanteric region of

both hips, the lateral and posterior facets. (*Id.*). Giordano assessed tightness of the iliotibial bands bilaterally. (*Id.*). Giordano noted that Kretovic could flex, abduct and adduct the hip against resistance with minimal pain, but noted some mild weakness on the resisted hip abduction. (*Id.*). She demonstrated five out of five strength in her lower extremities and could perform the straight leg raise test without pain. (*Id.*). Kretovic's sensation was intact. (*Id.*).

Giordano opined that Kretovic could continue non-operative measures, including avoidance of strenuous activities, activity modifications, anti-inflammatories, focused stretching, or she could undergo an endoscopic trochanteric bursectomy with partial iliotibial band release, inspection of the gluteus medius and minimus tendons and repair, if necessary. (*Id.*).

That same day, Kretovic underwent a GAITRite study ordered by Giordano. (Tr. 517). The study indicated that Kretovic's velocity was slower than expected and she spent increased time on the left stance phase with reduced swing time, step length and stride length on the left side likely due to hip pain. (*Id.*).

## B.    <u>Medical Opinion Evidence[4]</u>

On May 12, 2011, state examiner Sandra Boehlert ("Boehlert"), MD, conducted a consultative internal medicine examination of Kretovic. (Tr. 380-84). Kretovic reported that she suffered from left hip arthritis and had gone to physical therapy and been evaluated by an orthopedic surgeon. (*Id.*). According to Kretovic, she took medication to manage her pain and began using a cane the previous year. (*Id.*). She reported that she had been experiencing hip pain for over a year and had received cortisone injections in both hips, which provided only slight relief. (*Id.*).

---

[4]    The record contains medical opinions regarding Kretovic's mental functional capacity from state examining and non-examining physicians. Kretovic does not challenge the ALJ's mental RFC determination, and those opinions are thus not summarized herein.

Kretovic also reported that she had suffered from low back pain for more than a year.  (*Id.*).  She reported that she is treated at a pain clinic to manage her pain and had received injections with minimal relief.  (*Id.*).  Kretovic indicated that she had been recommended for surgery, but had declined because of the projected 40% recovery rate.  (*Id.*).  Kretovic reported that she could only walk one-quarter to one-half mile and experiences back pain when walking, bending, twisting and standing.  (*Id.*).  According to Kretovic, the results of a recent MRI indicated that she had two herniated discs in her lumbar spine.  (*Id.*).

In addition, Kretovic reported that she suffered from right shoulder tendinopathy, but that her condition had improved after shoulder surgery in 2009.  (*Id.*).  Kretovic stated that she continues to experience pain with overhead reaching, despite the surgery.  (*Id.*).

Kretovic reported that she cooks and cleans twice per week.  (*Id.*).  According to Kretovic, she does not go shopping regularly due to the amount of walking involved and is unable to do laundry because it would require her to use the stairs.  (*Id.*).  Kretovic is able to dress and bathe, but needs supervision bathing to avoid falls.  (*Id.*).  Kretovic reported that she enjoys watching television, reading and socializing with friends.  (*Id.*).

Upon examination, Boehlert noted that Kretovic had a normal gait and did not appear to be in acute distress.  (*Id.*).  Kretovic was able to walk on her heels with good balance, but was unable to walk on her toes due to left hip pain and difficulties balancing.  (*Id.*).  Kretovic was able to squat only partially due to balance issues.  (*Id.*).  Boehlert noted that Kretovic had a cane, which she did not use to walk in the room, but did use to walk down the hall.  (*Id.*).  Boehlert opined that the cane was necessary for long-distance walking or walking on uneven surfaces.  (*Id.*).  Boehlert also noted that Kretovic was able to change for the examination, get on and off the examination table without assistance, and rise from her chair without difficulty.  (*Id.*).

Boehlert noted that Kretovic's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally. (*Id.*). Boehlert identified no scoliosis, kyphosis or abnormality in her thoracic spine. (*Id.*). Boehlert found that Kretovic's lumbar flexion was limited to 70 degrees and that she had full extension, lateral flexion to 20 degrees, and rotation to 20 degrees with tenderness over the lumbar spine and paraspinal muscles bilaterally. (*Id.*). The straight leg raise was negative bilaterally. (*Id.*). Boehlert assessed full range of motion in both shoulders, including full adduction, internal and external rotation, but noted pain with forward elevation and abduction above 130 degrees. (*Id.*). Boehlert noted full range of motion bilaterally in Kretovic's elbows, forearms, wrists, knees and ankles. (*Id.*). According to Boehlert, Kretovic's right hip demonstrated full range of motion and her left hip had full flexion and extension with interior rotation limited to 35 degrees, exterior rotation limited to 45 degrees, backward extension limited to 25 degrees, abduction limited to 35 degrees and adduction limited to 18 degrees. (*Id.*). Boehlert noted tenderness with range of motion exercises of the left hip and tenderness to palpation of the left hip. (*Id.*). Boehlert assessed strength as five out of five in the upper and lower extremities with intact sensation and no evidence of atrophy. (*Id.*). Boehlert found Kretovic's hand and finger dexterity to be intact and her grip strength to be five out of five bilaterally. (*Id.*).

Boehlert diagnosed Kretovic with left hip arthritis, low back pain, right shoulder tendinopathy and psychological disorder. (*Id.*). She opined that Kretovic had moderate limitations for heavy ambulation or walking on uneven ground, repetitive pushing and pulling, heavy lifting or exertional activity in the standing position, and mild limitation for overhead reaching with the right arm or heavy exertional use of the right arm repetitively. (*Id.*).

III.     **Non-Medical Evidence**

In her application for benefits, Kretovic reported that she was born in 1962. (Tr. 255).  Kretovic reported that she had completed the twelfth grade in regular education classes.  (Tr. 268).  According to Kretovic, she has been employed as a medical secretary since 1991.  (Tr. 278).  At the time of her application, Kretovic continued to be employed one day a week for four hours.  (*Id.*).

Kretovic reported that she does not care for any family members or pets and that she needs assistance with her personal hygiene.  (Tr. 299-301, 310-11).  According to Kretovic, her husband or son assists her to get out of bed in the morning and walk to the kitchen.  (*Id.*). She reported that she able to care for her own personal hygiene from the waist up, but needs assistance with the remaining aspects of her personal hygiene.  (*Id.*).  According to Kretovic, her husband supervises her while in the shower, shaves her legs and washes her hair.  (*Id.*).  If she is alone, she sits on the bed in order to put on her pants, socks and shoes.  (*Id.*).  According to Kretovic, her husband or son assists her to get on and off the toilet in the mornings and evenings, when her pain is worse.  (*Id.*).

Kretovic reported that she assists her family in preparing meals by sitting to chop vegetables, but her husband or son cooks the meal and cleans the dishes.  (Tr. 301-02). According to Kretovic, she has difficulty standing to cook, although she does prepare some quick meals, and her husband performs most of the household chores that require standing, including sweeping, mopping and taking out the garbage.  (*Id.*).  She does some chores from a seated position, including cleaning countertops and tables and cleaning the refrigerator.  (*Id* ).  Kretovic reported that she folds and hangs laundry.  (*Id.*).

Kretovic reported that she does not frequently leave the house and is typically accompanied by her husband or son when she does.  (Tr. 302-03).  She is able to drive, but has difficulty getting in and out of the car.  (*Id.*).  Kretovic's husband does most of the grocery shopping, although she goes with her family about once a month.  (*Id.*).  When she does, she uses a wheelchair.  (*Id.*).

According to Kretovic, she enjoys reading, watching television, playing backgammon, cards and dice, and doing crafts projects.  (Tr. 303-04).  Kretovic is no longer able to participate in activities that she used to enjoy, such as sports, attending exercise classes and walking her dog.  (*Id.*).  She reported that she talks to her friends on the phone every day and that they visit her once or twice a week.  (*Id.*).  According to Kretovic, she goes to the library and visits her in-laws approximately once every two weeks.  (*Id.*).

She reported that she suffers from troubled sleep due to pain.  (Tr. 300).  According to Kretovic, she is no longer able to lift objects and can stand only approximately thirty minutes at a time.  (Tr. 304).  Kretovic stated that her ability to walk is limited and she uses a cane, a standard wheelchair or a motorized scooter to ambulate.  (Tr. 305).  Kretovic estimated that she can walk approximately one-quarter to one-half mile before needing to rest for ten to twenty minutes.  (Tr. 306).  Kretovic reported that the cane was prescribed, as was her use of a handicapped parking sticker.  (*Id.*).  According to Kretovic, she can sit for up to four hours with breaks and often sits in her reclining chair.  (Tr. 305).  In addition, Kretovic stated that she is unable to kneel or squat and has a limited ability to reach or climb stairs.  (*Id.*).

Kretovic reported that she began experiencing pain following a 2009 motor vehicle accident.  (Tr. 307).  According to Kretovic, she experiences pain in her low back and her left and right hips.  (*Id.*).  She described the pain as a constant, grinding, dull pain, which is

sometimes sharp and shooting. (*Id.*). Kretovic reported that her cortisone injections initially provided relief, but they had become ineffective. (Tr. 308).

According to Kretovic, her pain is aggravated by walking, climbing stairs, sitting too long and bending over. (*Id.*). She reported that she has tried anti-inflammatory pills, cortisone injections, Percocet, Vicodin, Naprosyn and muscle relaxants to manage her pain, but none have provided complete relief of her pain. (Tr. 308-09). She also attempts to alleviate her pain by lying down, using a cane for ambulation, applying heat, or sitting in a tub with jets. (*Id.*). According to Kretovic, her pain medications cause constipation. (*Id.*).

During the administrative hearing, Kretovic testified that she had graduated from high school and had obtained training and certificates for medical office work. (Tr. 36). She testified that she had previously worked as a medical receptionist, a medical service switchboard operator, a pharmaceutical technician and a certified nursing assistant. (Tr. 36-41). According to Kretovic, her last employment was as a receptionist at a medical office, which she began in June 2007 on a part-time basis, working four-hour shifts two days a week and an eight-hour shift one day a week. (Tr. 36-37). According to Kretovic, she generally worked those hours, although she might occasionally have logged more hours covering shifts for coworkers. (*Id.*).

Kretovic testified that in July 2010 she reduced her hours to one four-hour shift due to her medical impairments and stopped working in November 2011 because her position was changed to full-time. (Tr. 37-38, 52-53). She explained that she did not believe that she could work on a full-time basis, although she believed that she could continue to work on a part-time basis. (*Id.*).

Kretovic testified that she was unable to work due to pain, which she described as distracting, making it difficult to stay in one position for a long time. (Tr. 43). She also testified

that her medication makes it difficult to focus.  (Tr. 43, 53).  According to Kretovic, her pain is constant and is located primarily in the bottom part of her spine and her left hip.  (Tr. 43). Kretovic takes medication and applies heat or ice throughout the day.  (Tr. 43-44).  Her pain is aggravated by long periods of activity or by sitting for prolonged periods.  (Tr. 44).  Kretovic testified that when she sits, she leans towards her right side to alleviate the pressure on her spine. (*Id.*).  She explained that she has received cortisone injections that provide some relief for up to four months, although the "peak" relief lasts only approximately three weeks.  (Tr. 44-45). Kretovic testified that she is limited to four injections a year.  (*Id.*).

During a typical day, Kretovic takes her medications and applies a heating pad, watches television, reads, does paperwork, washes dishes, prepares meals, walks around her house, and folds and puts away clean laundry.  (Tr. 46-47).  Kretovic testified that she spends much of her time in her recliner or in a comfortable padded chair in her kitchen.  (Tr. 47).  She also testified that she takes short naps approximately three times a week because she has difficulty sleeping at night due to her pain.  (*Id.*).

Kretovic testified that she could walk approximately one-quarter mile before experiencing increased pain and that she uses her cane to walk any significant distance.  (Tr. 48). She also uses the cane to get in or out of a car.  (Tr. 49).  Kretovic estimated that she could stand for approximately twenty minutes before needing to sit down and believed she would be able to lift a laundry basket.  (*Id.*).

Vocational expert, Peter Manzi ("Manzi"), also testified during the hearing. (Tr. 59-67).  The ALJ first asked Manzi to characterize Kretovic's previous employment. (Tr. 60).  According to Manzi, Kretovic had been employed as a medical secretary, a receptionist, a telephone answering service operator and a pharmacy technician.  (*Id.*).

The ALJ then asked Manzi whether a person would be able to perform any of the work that Kretovic had previously performed who was of the same age as Kretovic, with the same education and vocational profile, who was limited to sedentary work, but would require the option of alternating between sitting and standing in half-hour increments and permission to use a cane when ambulating in excess of one-quarter mile, who could only occasionally climb ramps or stairs, balance, or stoop, and who was precluded from climbing ladders, ropes or scaffolds, kneeling, crouching, and crawling.  (*Id.*).  Manzi testified that such an individual would be unable to perform the identified positions, but would be able to perform other positions in the national economy, including a photocopy machine operator and a collator operator.  (Tr. 62-63). According to Manzi, those positions would permit such an individual to be off-task up to 12% of the time, but an individual who was off-task 15% or more of the workday would not be able to maintain competitive employment.  (Tr. 64).  Kretovic's attorney asked Manzi whether the same positions would be available for an individual who could stand for no more than twenty minutes at a time.  (Tr. 65).  Manzi replied that they would not.  (*Id.*).

## DISCUSSION

### I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*
whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's
conclusions are supported by substantial evidence in the record as a whole or are based on an
erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.
§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits
is directed to accept the Commissioner's findings of fact unless they are not supported by
"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to
any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is
defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401
(1971) (internal quotation omitted).

   To determine whether substantial evidence exists in the record, the court must
consider the record as a whole, examining the evidence submitted by both sides, "because an
analysis of the substantiality of the evidence must also include that which detracts from its
weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent
they are supported by substantial evidence, the Commissioner's findings of fact must be
sustained "even where substantial evidence may support the claimant's position and despite the
fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.
Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d
60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

   A person is disabled for the purposes of SSI and disability benefits if he or she is
unable "to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1)    whether the claimant is currently engaged in substantial
>          gainful activity;

> (2)    if not, whether the claimant has any "severe impairment"
>          that "significantly limits [the claimant's] physical or mental
>          ability to do basic work activities";

> (3)    if so, whether any of the claimant's severe impairments
>          meets or equals one of the impairments listed in Appendix
>          1 of Subpart P of Part 404 of the relevant regulations;

> (4)    if not, whether despite the claimant's severe impairments,
>          the claimant retains the residual functional capacity to
>          perform his past work; and

> (5)    if not, whether the claimant retains the residual functional
>          capacity to perform any other work that exists in significant
>          numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

   A.    **The ALJ's Decision**

              In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 13-20).  Under step one of the process, the ALJ found that Kretovic has

not engaged in substantial gainful activity since the alleged onset date.  (Tr. 15).  At step two, the

ALJ concluded that Kretovic has the severe impairments of arthritis, bursitis and degenerative

disc disease. (*Id.*). The ALJ concluded that Kretovic's mental impairments and degenerative

joint disease and tendinopathy in her right shoulder were not severe. (Tr. 15-16). At step three,

the ALJ determined that Kretovic does not have an impairment (or combination of impairments)

that meets or medically equals one of the listed impairments, including Listings 1.02 and 1.04.

(Tr. 16). The ALJ concluded that Kretovic has the RFC to perform sedentary work, except that

she requires the option of alternating between standing and sitting in half-hour increments and

the use of a cane to ambulate in excess of one-quarter mile, can only occasionally climb ramps or

stairs, balance or stoop, and is precluded from climbing ladders, ropes or scaffolds, kneeling,

crouching, and crawling. (*Id.*). At step four and five, the ALJ determined that prior to March 23,

2012, Kretovic was unable to perform her prior work, but that other jobs existed in the national

and regional economy that she could perform, including the positions of photocopy machine

operator and collator operator. (Tr. 19-20). Accordingly, the ALJ found that Kretovic was not

disabled before March 23, 2012. (*Id.*). The ALJ further determined that Kretovic's age category

changed on March 23, 2012 and that as of that date, considering her age, education, work

experience and RFC, there were no jobs in the national economy that she could perform.

(Tr. 20). Accordingly, the ALJ found that Kretovic became disabled on March 23, 2012

pursuant to Medical-Vocational Rule 201.14. (*Id.*).

**B.** **Kretovic's Contentions**

Kretovic contends that the ALJ's determination that she is not disabled is not

supported by substantial evidence and is the product of legal error. (Docket # 10-1). First,

Kretovic contends that the ALJ failed to apply the appropriate legal standards in assessing her

credibility and improperly discounted her subjective complaints of pain. (*Id.* at 11-15). Next,

Kretovic contends that the ALJ failed to adequately develop the record by requesting opinions

from her treating physicians and that his RFC assessment is otherwise unsupported by substantial

evidence. (*Id.* at 15-21). Finally, Kretovic contends that the ALJ erred by failing to adequately

evaluate whether her impairments met or medically equaled Listing 1.04. (*Id.* at 22-25).


## II.   Analysis

### A.   Step Three Determination

Kretovic contends that the ALJ erred in concluding that she did not have an

impairment or combination of impairments that met or medically equaled one of the listed

impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. Specifically, Kretovic contends that the

ALJ failed to adequately explain his determination that she did not meet or medically equal the

requirements of Listing 1.04A and that his determination is not supported by any medical

evidence. (Docket ## 10-1 at 21-25; 19 at 1-4). Further, Kretovic contends that the record

evidence establishes that her impairments meet the requirements of that listing or, at a minimum,

conflicting evidence exists on that question. (*Id.*). The government disagrees, contending that

Kretovic has failed to present any evidence that she satisfies Listing 1.04A. (Docket # 12 at

17-18).

If a claimant's impairments meet or medically equal the criteria set forth in

Appendix 1 to Subpart P of Part 404 of the regulations, the claimant is automatically entitled to

benefits. *See DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) ("[t]he Social Security

regulations list certain impairments, any of which is sufficient, at step three, to create an

irrebuttable presumption of disability") (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The

claimant carries the burden of demonstrating that her impairments meet or are equal in severity

to one of the listings and in order to meet this burden, the claimant is required to show that her

impairment meets each of the medical criteria set forth in the listing.  *See Sullivan v. Zebley*, 493
U.S. 521, 530 (1990) (impairment does not qualify if it "manifests only some of those criteria, no
matter how severely").

An ALJ is required to explain his determination that a claimant failed to meet or
equal the listings "[w]here the claimant's symptoms as described by the medical evidence appear
to match those described in the [l]istings." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 273
(N.D.N.Y. 2009).  Nevertheless, "[a]n ALJ's unexplained conclusion at step three of the analysis
may be upheld where other portions of the decision and 'other clearly credible evidence'
demonstrate that the conclusion is supported by substantial evidence." *Ryan v. Astrue*, 5
F. Supp. 3d 493, 507-08 (S.D.N.Y. 2014) (citing *Berry*, 675 F.2d at 469 (affirming ALJ's
decision at step three even though it did not articulate its rationale "since portions of the ALJ's
decision and the evidence before him indicate that his conclusion was supported by substantial
evidence")); *see also Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 113 (2d Cir. 2010)
("[a]lthough we have cautioned that an ALJ should set forth a sufficient rationale in support of
his decision to find or not to find a listed impairment, the absence of an express rationale . . .
does not prevent us from upholding [the determination] so long as we are able to look to other
portions of the ALJ's decision and to clearly credible evidence in finding that his determination
was supported by substantial evidence") (internal quotations omitted); *Sava v. Astrue*, 2010 WL
3219311, *4 (S.D.N.Y. 2010) (affirming determination of ALJ at step three where there was
"sufficient uncontradicted evidence in the record to provide substantial evidence for [that]
conclusion").  In contrast, "where the evidence on the issue of whether a claimant meets or
equals the listing requirements is [in] equipoise and 'credibility determinations and inference

drawing is required of the ALJ' to form his conclusions at step [three], the ALJ must explain his

reasoning." *Ryan v. Astrue*, 5 F. Supp. 3d at 507-08 (quoting *Berry*, 675 F.2d at 469).

Listing 1.04A, entitled "Disorders of the spine," (the "Listing") provides, in

relevant part:

> *Disorders of the spine* (*e.g.*, herniated nucleus pulposus, spinal
> arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc
> disease, facet arthritis, vertebral fracture), resulting in a
> compromise of a nerve root (including cauda equine) or the spinal
> cord.  With:
>
> > A.  Evidence of nerve root compression characterized by
> >     neuro-anatomic distribution of pain, limitation of
> >     motion of the spine, motor loss (atrophy with associated
> >     muscle weakness or muscle weakness) accompanied by
> >     sensory or reflex loss and, if there is involvement of the
> >     lower back, positive straight-leg raising test (sitting and
> >     supine).

20 C.F.R. Part 404, Subpt. P, App. 1.  Thus, to establish that she meets the Listing, Kretovic

must demonstrate that she suffers from nerve root compression and each of the four

characteristics set forth in the Listing.

Kretovic has marshalled evidence from the record that she contends shows she

meets the Listing.  The government counters that she has not demonstrated that she suffers from

nerve root compression, sensory or reflex loss, or a positive straight leg raise.  I agree.  Kretovic

has not adduced evidence establishing that her impairment meets the Listing because her spine

impairment involves the lower back and she has repeatedly tested negative when performing the

straight leg raising test (Tr. 354-55, 358-59, 364-66, 380-84, 418-19, 422, 423, 425-26, 427, 440,

454, 458, 465, 466, 467, 508-09, 514-15, 543-44) and has routinely demonstrated full strength

and sensation in her extremities (Tr. 352-53, 354-55, 358-59, 380-84, 409-10, 418-19, 420, 422,

425-26, 427, 428, 460-63, 464, 465, 466, 508-09, 514-15, 533-34, 535-36, 537-38, 539-40,

543-44, 554-57).  *See Hunt v. Astrue*, 2009 WL 3076209, *7 (N.D.N.Y. 2009) (claimant failed to present "substantial medical evidence of motor loss" despite references in the record to complaints of weakness and slightly diminished strength test results).

In this case, the ALJ explicitly considered whether Kretovic meets the requirements of the Listing and determined that she does not.  (Tr. 16).  In support of that determination, the ALJ responded that Kretovic has not established the required level of motor, sensory or reflex loss and cited Boehlert's report that demonstrated Kretovic's reflexes, senses and strength were intact and that no muscle atrophy was evident.  (Tr. 15, 16, 383).  Although the ALJ's evaluation of the Listing could have been more thorough, the evidence nonetheless establishes that Kretovic's impairment does not meet the Listing, and remand is not required. *See Beebe v. Astrue*, 2012 WL 3791258, *4 (N.D.N.Y. 2012) ("ALJ's failure to provide a specific rationale for finding that plaintiff's spinal impairment did not meet Listing 1.04A" did not require remand where "plaintiff ha[s] not established that she satisfied all the criteria symptoms of the Listing"); *Tilbe v. Astrue*, 2012 WL 2930784, *10 (N.D.N.Y. 2012) ("any error in the ALJ's failure to consider whether plaintiff's impairment met or equaled Listing 1.04 is harmless because no view of the evidence would support a finding that plaintiff's impairment met all the specified medical criteria of Listing 1.04"); *Hunt v. Astrue*, 2009 WL 3076209 at *7 ("[w]hile the ALJ did not elaborate on his findings in the portion of his decision addressed to step 3, the record contains substantial evidence supporting the ALJ's determination that [p]laintiff did not meet the requirements of Listing 1.04").

B.    **Credibility Assessment**

I turn next to Kretovic's contention that the ALJ failed to apply the appropriate

legal standard in assessing the credibility of her testimony regarding the intensity, persistence

and limiting effects of her pain.  (Docket # 10-1 at 11-15).

"Evidence of pain is an important element in the adjudication of DIB and SSI

claims, and must be thoroughly considered in calculating the RFC of a claimant."  *Meadors v.*

*Astrue*, 370 F. App'x 179, 185 (2d Cir. 2010).  Generally, a claimant's statements of pain or

other limitations are not sufficient alone to establish a medically determinable impairment;

instead, "plaintiff must demonstrate by medical signs or findings that she has a condition that

could reasonably be expected to produce the alleged symptoms."  *Taylor v. Barnhart*, 83

F. App'x 347, 350 (2d Cir. 2003); *Meadors v. Astrue*, 370 F. App'x at 185 ("[a] claimant who

alleges a disability based on the subjective experience of pain need not adduce direct medical

evidence confirming the extent of the pain, but [instead] medical signs and laboratory findings

which show that the claimant has a medical impairment which could reasonably be expected to

produce the pain") (quotations omitted) (alteration in original); *see Skiver v. Colvin*, 2014 WL

800228, *6 (W.D.N.Y. 2014).  "While subjective pain may serve as the basis for establishing

disability, even if such pain is unaccompanied by positive clinical findings, the ALJ is

nonetheless empowered to exercise discretion to arrive at an independent judgment, in light of

medical findings and other evidence, regarding the true extent of the pain alleged by the

claimant."  *Taylor v. Barnhart*, 83 F. App'x at 350 (internal quotations and citations omitted).

The regulations provide for a two-step inquiry to evaluate a claimant's

contentions of pain.  *See Meadors*, 370 F. App'x at 183 (citing SSR 96-7P, 1996 WL 374186

(1996); 20 C.F.R. § 404.1529(c)).  The ALJ must first determine whether "the claimant suffers

from a 'medically determinable impairment[] that could reasonably be expected to produce' the pain alleged." *See id.* (quoting 20 C.F.R. § 404.1529(c)(1)).  Second, the ALJ "'must then evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting 20 C.F.R. § 416.929(c)(1)).  "To the extent that the claimant's pain contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors*, 370 F. App'x at 183-84 (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

Accordingly, when the claimant alleges "symptoms of greater severity than can be established by the objective medical findings, the ALJ will consider other evidence, including factors such as the daily activities; the nature, extent and duration of symptoms; and the treatment provided." *See Skiver v. Colvin*, 2014 WL 800228 at *6 (citing 20 C.F.R. § 416.929(c)(3)).  Specifically, the ALJ must assess the claimant's subjective complaints of pain by evaluating the following factors:

(1)  [the claimant's] daily activities;

(2)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(3)  [p]recipitating and aggravating factors;

(4)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [the claimant's] pain or other symptoms;

(5)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [the claimant's] pain or other symptoms;

(6)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve pain or other symptoms; and

(7)     [o]ther factors concerning [the claimant's] functional
        limitations and restrictions due to pain or other symptoms.

*Cichocki v. Astrue*, 534 F. App'x at 76 (alterations in original) (quoting 20 C.F.R.

§ 416.929(c)(3)).  The ALJ should also consider other facts affecting credibility, including the

claimant's prior work history.  *Johnson v. Astrue*, 748 F. Supp. 2d 160, 173 (N.D.N.Y. 2010)

(citing SSR 96-7P, 1996 WL 374186 (S.S.A.)).

        "If, after considering [claimant's] subjective testimony, the objective medical

evidence and any other factors deemed relevant, the ALJ rejects [the claimant's] subjective

testimony, he must explain that decision explicitly and with sufficient specificity that a reviewing

court may be able to decide whether there are legitimate reasons for the ALJ's disbelief and

whether his decision is supported by substantial evidence."  *Norman v. Astrue*, 912 F. Supp. 2d

33, 43 (S.D.N.Y. 2012) (quotations omitted).  If the ALJ's credibility determination is not

sufficiently detailed so as to "permit the reviewing court to determine whether there are

legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial

evidence, remand is appropriate."  *Fernandez v. Astrue*, 2013 WL 1291284, *18 (E.D.N.Y.

2013).

        In his decision, the ALJ recognized his duty to conduct the two-step inquiry.

(Tr. 16-17).  In conducting the inquiry, the ALJ concluded "after careful consideration of the

evidence" that Kretovic's "medically determinable impairments could reasonably be expected to

cause certain of the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not credible to the extent they

are inconsistent with the residual functional capacity assessment."  (Tr. 17).  According to the

ALJ, he found Kretovic only "partially credible regarding the severity of her limitations."  (*Id.*).

44

In support of his credibility determination, the ALJ recounted some of the objective medical evidence in the record and noted that although the medical evidence demonstrated that Kretovic suffered from ongoing impairments to her left hip and lumbar spine, her physical examinations nevertheless demonstrated full strength, intact reflexes, intact sensation and negative straight leg test results. (*Id.*). In addition, the ALJ stated that the record demonstrated that Kretovic continued to work after her alleged disability onset date until late 2011 "at times on a full time basis according to her testimony." Finally the ALJ noted that Kretovic's treating orthopedic specialist had noted in February 2011 that Kretovic was working without restrictions and "he assigned her an impairment rating of 0%."

Although the ALJ provided specific reasons for discounting Kretovic's credibility, at least two of the proffered reasons do not support his determination. First, the ALJ's statement that Kretovic worked "at times on a full time basis" after her alleged onset date is inaccurate. *See Horan v. Astrue*, 350 F. App'x 483, 484-85 (2d Cir. 2009) ("[b]ecause the ALJ's credibility determination was based largely on these factual errors, we cannot say that it is supported by substantial evidence"). Rather, her testimony demonstrated that beginning in 2007 Kretovic routinely worked one eight-hour shift and two four-shifts per week. (Tr. 37). In July 2010, at the time of her alleged onset date, Kretovic's hours were reduced to a single weekly four-hour shift that she maintained until she stopped working altogether in November 2011. (Tr. 37-38, 42-43). Thus, her testimony demonstrates that she only worked part-time after her alleged onset date and explains her other testimony that she believed she could continue to work part-time, but not full-time. (Tr. 53).

Second, Tomaino's treatment records – the ALJ's final reason for discounting Kretovic's credibility – also do not support his decision. Tomaino's treatment records reflect

that he treated Kretovic only for her right shoulder impairment.  (Tr. 448-52).  Nothing in his records suggests that he evaluated her left hip or lumbar spine impairments.  (*Id.*).  Tomaino's statements that the ALJ relied upon related solely to Kretovic's right shoulder impairment and are consistent with her testimony that she no longer suffered from limitations due to her right shoulder impairment.  (Tr. 51).  Thus, Tomaino's statements do not support the ALJ's determination of limited credibility.

The only remaining basis provided by the ALJ for discounting Kretovic's testimony was his recitation of the objective medical evidence.  According to the ALJ, Kretovic's treating physician and the consulting physician assessed that she demonstrated a normal gait, full strength and reflexes, and intact sensation.  The ALJ did not address the fact that, despite these assessments, Kretovic's treating physician continued to treat her reports of pain with a prescribed pain management regimen that included prescription narcotics and steroid injections and that Giordano recommended surgery as an option to address Kretovic's left hip impairment.  Additionally, the ALJ's decision does not make clear whether he considered all of the required regulatory factors, including the triggers that precipitate and aggravate Kretovic's pain, the measures that Kretovic uses to relieve her pain and the effectiveness and side effects of her pain management regimen.

In sum, although the ALJ recited the record evidence, he did not adequately explain why he concluded that Kretovic's complaints of debilitating pain were not credible.  A recitation of the evidence, without more, is insufficient to permit this Court to review the ALJ's credibility determination.  *See Norman v. Astrue*, 912 F. Supp. 2d at 44 ("[t]he recitation of medical evidence, without more, is not a stand-in for a 'meaningful analysis of how those factors

detracted from [the plaintiff's] credibility'") (quoting *Kerr v. Astrue*, 2010 WL 3907121, *4

(N.D.N.Y.), *report and recommendation adopted*, 2010 WL 3893922 (N.D.N.Y. 2010)).

Accordingly, I conclude that the ALJ erred by failing to address the applicable

factors and to adequately explain his credibility determination.  *See Fernandez v. Astrue*, 2013

WL 1291284 at *19 ("[t]he ALJ . . . erred in failing to provide any further basis for finding

[p]laintiff not credible and did not evaluate [p]laintiff's testimony in light of the seven factors as

required"); *Norman*, 912 F. Supp. 2d at 44 ("[w]hat is missing from such an analysis is any

explanation as to why [p]laintiff's subjective complaints were found less than fully credible")

(internal quotation omitted); *Felder v. Astrue*, 2012 WL 3993594, *15 (E.D.N.Y. 2012)

("[b]ecause the ALJ did not discuss . . . all the applicable factors set forth in 20 C.F.R.

§ 404.1529(c)(3)(i)-(vii) in making [his] credibility determination analysis, the ALJ has

committed legal error"); *Johnson v. Astrue*, 748 F. Supp. 2d at 174 (remanding to permit the ALJ

to "provide a more thorough explanation" for his credibility assessment).  A remand for further

proceedings under these circumstances is appropriate because this Court is unable to evaluate

whether the ALJ's credibility determination is supported by substantial evidence.  *Norman*, 912

F. Supp. 2d at 86 ("[b]ecause I find legal error requiring remand, I do not reach the issue of

whether the ALJ's decision was supported by substantial evidence").

Because I conclude that the ALJ's credibility assessment was the result of legal

error, I am unable to meaningfully review the ALJ's physical RFC analysis, and I do not reach

Kretovic's remaining contentions regarding the ALJ's physical RFC assessment.  *See Meadors*,

370 F. App'x at 185-86 ("[b]ecause we conclude that the ALJ erred in assessing [claimant's]

credibility, thereby depriving us of the ability to subject his RFC determination to meaningful

review, we do not reach [claimant's remaining contentions]").

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket # 13**) is **DENIED**, and Kretovic's motion for judgment on the pleadings (**Docket # 10**) is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 24, 2015